## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ACT FOR HEALTH, d/b/a PROFESSIONAL
CASE MANAGEMENT,

      Petitioner,

v.

UNITED STATES DEPARTMENT OF
LABOR; ALEXANDER ACOSTA, in his
official capacity as Secretary of the U.S.
Department of the Labor; OFFICE OF
WORKERS' COMPENSATION PROGRAMS;
and Julia Hearthway, in her official capacity as
Director of the Office of Workers' Compensation
Programs,

      Respondents.

---

## COMPLAINT / PETITION FOR REVIEW OF FINAL AGENCY ACTION

---

Petitioner ACT for Health, d/b/a Professional Case Management ("PCM"), through its

counsel, submits this Complaint/Petition for Review of Final Agency Action:

### INTRODUCTION

1.     PCM submits this Complaint/Petition for Review under the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701-706 and Local Rule D.C.COLO.LAPR 10.2(c).  On

February 8, 2019, the Office of Workers' Compensation Programs ("OWCP") within the

Department of Labor ("DOL") issued a final rule amending existing regulations governing the

administration of the Energy Employees Occupational Illness Compensation Program Act of

2000, as amended, 42 U.S.C. §§ 7384 *et. seq.* (the "Act" or "EEOICPA").  *See* "Claims for

Compensation Under the Energy Employees Occupational Illness Compensation Program Act,"

84 Fed. Reg. 3,036 (February 8, 2019) ("Final Rule").

2.  The EEOICPA provides much needed medical benefits and compensation to the

men and women who, often unwittingly, sacrificed their health in service to our country.

Congress passed the EEOICPA to establish an efficient and uniform compensation program for

these individuals that abandons the old presumption against benefits and removes administrative

hurdles to compensation.  Although the Final Rule purports to clarify and amend existing

regulations to improve the administration of the Act, the Final Rule does the exact opposite.  The

Final Rule's regulatory amendments are inconsistent with the Act's plain language, and its

remedial nature and purpose, increasing the administrative burden on claimants to timely obtain

the benefits they desperately need.  The Final Rule is invalid and must be set aside because it is

arbitrary and capricious and otherwise not in accordance with law.  *See* 5 U.S.C. § 706.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the laws

of the United States); 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed

plaintiff); and 5 U.S.C. §§ 701-706 (APA).  An actual controversy exists between the parties

within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief,

injunctive relief, and other relief pursuant to 28 U.S.C. §§ 1361, 2201-2202 and 5 U.S.C.

§§ 705–706.

4.  Venue is proper under 28 U.S.C. § 1391(e)(1)(B)-(C) because this is the judicial

district in which PCM's principal place of business is located and thus where PCM resides.  In

addition, the Final Rule will directly and adversely affect PCM's ability to provide services to its clients under the Act in this judicial district.

## PARTIES

5. PCM is the largest and most experienced EEOICPA health care provider in the country, serving the needs of former uranium miners, millers and haulers, and former nuclear weapons workers since 2002. In addition, PCM has been a home health care provider under various state and federal programs since 1997. As a specialty home care provider, PCM is distinguished by its dedication and knowledge in meeting the unique needs of clients requiring extensive treatment and long-term care in the home. PCM's principal place of business is in Denver, Colorado.

6. Respondent DOL is a federal agency of the United States responsible for supervising the formulation, issuance, and enforcement of rules, regulations, policies, and forms by the OWCP.

7. Respondent OWCP is a federal agency within the DOL responsible for implementing and administering the EEOICPA.

8. Respondent Alexander Acosta is the United States Secretary of Labor ("Secretary"). He is authorized to issue, amend, and rescind the rules, regulations, policies, and forms of the DOL and OWCP. He is sued in his official capacity.

9. Respondent Julia Hearthway is the Director of the OWCP and is responsible for the rules and regulations formulated, issued, and enforced by the OWCP, including the Final Rule. She is sued in her official capacity.

## LEGAL BACKGROUND

10.     In 2000, Congress enacted the EEOICPA.  The EEOICPA established the Energy

Employees Occupational Illness Compensation Program for the purpose of "provid[ing] timely,

uniform, and adequate compensation for covered employees and, where applicable, survivors of

such employees, suffering from illnesses incurred ... in the performance of duty for the

Department of Energy and certain of its contractors and subcontractors."  42 U.S.C. § 7384d(b).

11.     Congress established the compensation program because "a large number of

nuclear weapons workers at sites of the Department of Energy ... were put at risk without their

knowledge and consent...."  *Id*. § 7384(a)(2).  And, in the past, it had been "[t]he policy of the

Department of Energy … to litigate occupational illness claims, which ha[d] deterred workers

from filing workers' compensation claims and ha[d] imposed major financial burdens for such

employees who have sought compensation."  *Id*. § 7384(a)(4).

12.     Accordingly, Congress found that "[t]o ensure fairness and equity, the civilian

men and women who, over the past 50 years, have performed duties uniquely related to the

nuclear weapons production and testing programs of the Department of Energy and its

predecessor agencies should have efficient, uniform, and adequate compensation for beryllium-

related health conditions and radiation-related health conditions."  *Id.* § 7384(a)(8).

13.     Part B of EEOICPA provides for the payment of either lump-sum monetary

compensation for the disability of a covered Part B employee due to an occupational illness or

for monitoring for beryllium sensitivity, as well as for medical and related benefits for such

illness.  Part B also provides for the payment of monetary compensation for the disability of a

covered Part B employee to specified survivors if the employee is deceased at the time of payment. *See id.* §§ 7384*l*-7384w-1; *see also* 20 C.F.R. § 30.0(a).

14. Part E of EEOICPA provides for the payment of monetary compensation for the established wage-loss and/or impairment of a covered Part E employee due to a covered illness, and for medical and related benefits for such covered illness. Part E also provides for the payment of monetary compensation for the death (and established wage-loss, where applicable) of a covered Part E employee to specified survivors if the covered Part E employee is deceased at the time of payment. *See* 42 C.F.R. §§ 7385s-7385s-16; 20 C.F.R. § 30.0(b).

15. By Executive Order dated December 7, 2000, President William J. Clinton authorized the DOL to adjudicate claims for benefits and administer the compensation program under the EEOICPA. Exec. Order. No. 13,179, 65 Fed. Reg. 77,487 (Dec. 7, 2000).

16. The DOL delegated its authority and assigned responsibility under the EEOICPA to the Director of the OWCP. 20 C.F.R. §§ 1.2(d), 30.1. The "Director of OWCP and his or her designees have the exclusive authority to administer, interpret and enforce the provisions of the Act." *Id.* § 30.1. The OWCP is responsible for reviewing and approving individual claims for benefits. *Id.* § 30.100(a).

17. The OWCP has promulgated regulations "governing filing, processing, and paying claims for benefits under both Part B and Part E of EEOICPA." *Id.* § 30.0. First, on June 8, 2005, the OWCP published interim final regulations implementing its responsibilities under the EEOICPA. 70 Fed. Reg. 33,590 (June 8, 2005). The interim rules took effect immediately but included a 60-day comment period. Then, after considering the comments received, the OWCP published its final rules implementing the EEOICPA, which were effective on February

27, 2007.  71 Fed. Reg. 78,520 (December 29, 2006).  The regulations have remained largely

unchanged until the issuance of the challenged Final Rule on February 8, 2019.

18.    The EEOICPA is a remedial statute enacted to benefit affected workers; therefore,

it and any regulations promulgated to implement the Act must be liberally construed and applied

to achieve the Act's purpose of providing a remedy to those workers who contracted life-

threatening illnesses after being unwittingly exposed to toxins while serving our country.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Final Rule - Rulemaking History

19.    The OWCP published its Notice of Proposed Rulemaking ("NPRM") in the

Federal Register on November 18, 2015.  80 Fed. Reg. 72,296 (Nov. 18, 2015).  In its NPRM,

the OWCP proposed amending certain regulations governing its administration of Parts B and E

of the EEOICPA regulations.

20.    The OWCP originally allowed a 60-day period for interested parties to comment

on the NPRM that was scheduled to close on January 19, 2016, but on that date it extended the

comment period another 30 days, through February 18, 2016.  81 Fed. Reg. 2,787 (February 18,

2016).  In addition, on April 5, 2016, the OWCP reopened the comment period for the NPRM

through May 9, 2016.  81 Fed. Reg. 19,518 (May 9, 2016).  During these comment periods, the

OWCP received a total of 493 timely comments. 84 Fed. Reg. at 3,026.

21.    On February 18, 2016, PCM submitted its comments on the NPRM, raising

numerous concerns that the OWCP's proposed rules were inconsistent with the EEOICPA's

plain language, and its remedial nature and purpose by imposing additional administrative

burdens on claimants, which could lead to delays and denials of benefits.

22.     On February 8, 2019 the OWCP issued the Final Rule, "Claims for Compensation Under the Energy Employees Occupational Illness Compensation Program Act," 84 Fed. Reg. 3,036 (February 8, 2019).

23.     The effective date of the Final Rule is April 9, 2019.  *Id.*

## II.    The Final Rule

24.     Arbitrarily ignoring the plain language, remedial nature and purpose of the Act, the Final Rule amends the implementing regulations to impose additional and unnecessary hurdles on claimants that increase the administrative burden and delay them from obtaining the benefits they are entitled to receive under the Act.

### A.    New Preauthorization Requirement

25.     The Final Rule imposes a preauthorization process for filing an initial claim for home healthcare, nursing home, and assisted living services.  84 Fed. Reg. at 3,034-35, 3,052 (amending 20 C.F.R. § 30.403 subsections (a)-(c)).  The amendments provide:

> (a) . . . OWCP will pay for approved periods of care by a registered nurse, licensed practical nurse, home health aide or similarly trained individual, *subject to the preauthorization* requirements described in paragraph (c) of this section. . . .
>
> (c) To file an initial claim for home health care, nursing home, or assisted living services, the beneficiary must submit Form EE–17A to OWCP and identify his or her treating physician. OWCP then provides the treating physician with Form EE–17B, which asks the physician to submit a letter of medical necessity and verify that a timely face-to-face physical examination of the beneficiary took place. This particular pre-authorization process must be followed only for the initial claim for home health care, nursing home, and assisted living services; any subsequent request for pre-authorization must satisfy OWCP's usual medical necessity requirements.

*Id.* at 3,052 (emphasis added).

26.     The new preauthorization process appears to provide a date of eligibility that depends on the date of the OWCP's issuance of preauthorization.  See 84 Fed. Reg. at 3,052. But, the Act unambiguously states the date of eligibility is the date a claim is filed:

> An individual receiving benefits under this section shall be furnished those benefits *as of the date on which that individual submitted the claim for those benefits* in accordance with this subchapter.

42 U.S.C. § 7384t(d) (emphasis added).

27.     Therefore, under the Act and existing regulations, authorization for in-home health care services already provided may be granted retroactively, back to the date that the claim was filed.  *Id.*; 20 C.F.R. § 30.400(a) (covered employees are entitled to receive compensation for medical services "retroactive to the date the claim for benefits for that occupational illness or covered illness under Part B or Part E of EEOICPA was filed.").

28.     Under the Final Rule's section 30.403, retroactive payment does not appear to be authorized since such care is "subject to preauthorization," which will likely result in the denial of care to eligible beneficiaries during the lengthy preauthorization process required under the Final Rule.

29.     The new preauthorization process requires multiple back-and-forth mailings between the claimant, the claimant's physician, and the OWCP. 84 Fed. Reg. at 3,034-35, 3,052. The use of mail to transmit multiple forms, as well as the time it takes for the claimant, the physicians, and the OWCP to complete such forms, could take as long as 60 days to complete. Under the Final Rule, new claimants for home healthcare may have to wait as much as 60 days for the care they need.

30.     In response to comments, the OWCP asserts that the new preauthorization process in section 30.403(c) is "merely a compilation of the current processes for preauthorization," but the addition of the multi-step form filing process is necessary because "OWCP does not [currently] require beneficiaries to identify the name of the treating physician at the time that home healthcare is requested." 84 Fed. Reg. at 3,035. This assertion is arbitrary and capricious and unreasonable because it (1) changes the statutory and regulatory framework that allows for the payment of benefits retroactive to the date of filing, and (2) is disingenuous because the claimant's physician is identified on the plan of care, the letter of medical necessity, and documentation of the face-to-face examination submitted for initial approval of home healthcare under the existing regulations.

31.     In addition to the conflict with the EEOICPA's plain language and the existing regulations, this preauthorization process ignores the remedial nature of the EEOICPA and Congress' intent to abandon a presumption against worker benefits. In passing the EEOICPA, Congress intended to "abandon this position . . . which has been a presumption against the worker in the past." 146 CONG. REC. H3346-02 (daily ed. May 18, 2000) (statement of Rep. Hunter).

32.     Congress enacted the EEOICPA because existing workers' compensation programs had failed to provide for the needs of these workers and their families. Those programs had imposed long latency periods, denied claims premised upon inadequate exposure data, and failed to account for the uniqueness of the hazards to which workers had been exposed. Exec. Order No. 13179, 65 Fed. Reg. 77487 (Dec. 7, 2000). Exacerbating this failure was the Department of Energy policy of fighting against workers' benefit claims. *Id.* In assessing the

obstacles that the government had already imposed upon claimants, members of Congress were clear in their intent: "We must not establish a program that makes it impossible for workers to receive compensation." 146 CONG. REC. H3346-02 (daily ed. May 18, 2000) (statement of Rep. Strickland).

33.    The Act was intended to *remove* obstacles and delays imposed by regulatory processes; yet, the new pre-authorization procedures, which impose a lengthy, multi-step process for preauthorization, will undoubtably cause delay of care to qualified claimants.

34.    Often, claimants need referrals to home health care on an emergency basis; for instance, upon discharge from a hospital or other medical facility, when terminal and facing end of life, when an existing family caregiver becomes ill or passes away, or due to a sudden change in condition. In these circumstances, the provider can take a calculated risk and begin providing the much-needed care knowing it may seek retroactive authorization under the current system. The Final Rule fundamentally changes this process.

35.    In 2017 and 2018, PCM estimates that approximately 36 percent of its new patients had a period of time where their physician prescribed, and PCM provided, home health care services but authorization was not in effect at the time services commenced. In each of these cases, the OWCP subsequently agreed with the medical necessity of the care and provided authorization retroactive to the start of care.

36.    According to the DOL Office of the Ombudsman's 2017 Annual Report to Congress on the Energy Employees Occupational Illness Compensation Program, the DOL experienced significant delays in approving home healthcare. The Annual Report is available at: https://www.dol.gov/eeombd/2017annualreport/OmbusdmanReport-2017.pdf.

37.     The Annual Report indicates that the second-highest number of complaints, grievances, and request for assistance related to "Delays" – second only to "General Requests for Assistance." Annual Report at 10.

38.     Specifically, the Annual Report found that: "In 2017, the vast majority of the complaints raising concerns about delays involved delays in authorizing/reauthorizing home health care." *Id.* at 56. "For many of the claimants [DOL] encountered, a delay in receiving authorization/reauthorization for home health care meant a delay in receiving care that had been prescribed by their treating physician." *Id.* at 55. "[I]n some instances claimants went without prescribed medical care as they awaited reauthorizations, while in other instances, claimants continued to receive care only because the provider did so with the hope that [the Division of Energy Employees Occupational Illness Compensation] DEEOIC would eventually approve the reauthorization." *Id.* at 55 n.76.

39.     Given the already-existing issue with timely approving requests for home healthcare, OWCP's new preauthorization requirement, coupled with the new date of eligibility being tied to the approval date creates an improper period of ineligibility that could potentially deny claimants the care they need for months and/or deny PCM payment for care provided before the new authorization date. In other words, claimants may be forced to forgo medically necessary and covered services until the conclusion of the lengthy preauthorization process.

40.     In response to comments submitted on the NPRM relating to the potential for delay and denial of home healthcare benefits to claimants, the OWCP arbitrarily defended the new preauthorization process by finding that it merely compiled the existing requirements for preauthorization. *See* 84 Fed. Reg. at 3,034-35. In other words, OWCP failed to acknowledge

the existing problems with authorization and arbitrarily exacerbated those problems by issuing the Final Rule.

41.     The Final Rule violates the Act's requirement to provide "timely" compensation to covered employees.  42 U.S.C. § 7384d(b).

42.     In addition, the delays caused by the preauthorization process may result in home healthcare providers, like PCM, violating state law and industry standards addressing the timeliness of care.  The effect of the proposed preauthorization process is to force home health care providers to choose between potentially violating existing laws and denying care, both precipitating further government-imposed obstacles to claimants' access to needed care.

43.     For example, in Washington State, where PCM provides medical services under the EEOICPA, the regulations require home care providers to begin services within seven days of a referral unless certain exceptions apply.  *See* W.A.C. § 246-335-420(3).  And, consistent with other federal and state laws, prevailing industry standards recommend that care be provided immediately upon prescription, generally within 48 hours.  Therefore, PCM may face potential regulatory violations when forced to choose between awaiting authorization under the new preauthorization process or denying care altogether.

**B.     Restrictions on Authorized Representatives**

44.     The Final Rule also imposes a new restriction that an authorized representative must comply with the OWCP's conflict of interest policy.  84 Fed. Reg. at 3,037, 3,053 (amending 20 C.F.R. § 30.601).  The result of such a requirement is that home healthcare workers (such as PCM, which has considerable experience navigating this complex Federal

benefits program), or paid family member caretakers cannot act as an authorized representative on behalf of claimants simply because they are compensated for their services.

45.    This creates an unnecessary burden on claimants who are unfamiliar with the claims processes (now made even more complicated by the Final Rule), unable to advocate for themselves, and rely on paid assistants to advocate on their behalf. This also forces family members to decide between serving as paid caregivers or as representatives for claimants.

46.    This aspect of the Final Rule unnecessarily imposes additional burdens on claimants seeking benefits, contrary to the remedial purpose of the EEOICPA.

47.    PCM raised all of the above concerns in its February 18, 2016 comment letter, as did other commenters. *See* 84 Fed. Reg. at 3,037. However, the OWCP summarily rejected these concerns stating: "The Department is not persuaded by any of the reasons given by these commenters to abandon the proposed application of the conflict-of-interest policy in this context, because the aim of the policy is to keep providers from straying outside of their proper roles as providers of medical treatment." *Id.* The OWCP's justification fails to recognize that in many instances family members are paid to serve as medical care providers. Such a broad sweeping rule improperly denies claimants the most appropriate advocate for their care.

## C.    Certification Requirement

48.    The Final Rule amends OWCP's process for enrolling providers with its bill processing agents and systems. *Id.* at 3,037. Specifically, the Final Rule imposes a requirement that a provider seeking to enroll certify that it satisfies "all applicable Federal and state licensure and regulatory requirements that apply to their specific provider or supplier type." *Id.* at 3,037,

3,053 (amending 20 C.F.R. § 30.700(a)).  But because the OWCP fails to define which

"licensure and regulatory requirements" are incorporated, the new requirement is overly vague.

**D.     Potential Change in Payment System**

49.     Both the NPRM and the Final Rule refer to a *potential* change to the payment

system, but fail to identify if or when such a change will be implemented, the factors OWCP will

consider in determining whether to adopt a new payment system, a timeline for evaluating or

implementing such a system, or any other details that would inform providers or claimants what

to expect or how this may impact them.  As a result, the OWCP deprived interested parties of the

opportunity to submit meaningful comments on the change in violation of the APA.

50.     Specifically, the Final Rule provides that:

> OWCP *may* adopt a Home Health Prospective Payment System
> (HHPPS), as developed and implemented by the Centers for
> Medicare and Medicaid Services (CMS) within HHS for Medicare,
> while modifying the allowable costs under Medicare to account for
> deductibles and other additional costs that are covered by
> EEOICPA. *If* adopted, home health care providers will be required
> to submit bills on Form OWCP–04 or UB–04 and to use Health
> Insurance Prospective Payment System codes and other coding
> schemes.

*Id.* at 3,054 (emphasis added); *see also id.* at 3,038 (the Final Rule "notes that … OWCP *may*

adopt the system, *or parts of that system*, in the future.") (emphasis added).

51.     Instituting a new payment system is a significant change in the payment scheme

for home health care services provided under the EEOICPA, and that will impact providers, who

have relied on the existing payment scheme for over a decade.  Contrary to the OWCP's

assertion (*id.* at 3,038), PCM and other leading EEOICPA providers do not "currently use" the

CMS system and, therefore, are not prepared for the changes should they ultimately be

implemented by the OWCP.  A change in the payment scheme will significantly alter both access to home health services and covered services for beneficiaries.

52.	Before an agency may finalize a rule, it must provide the public with a meaningful opportunity to participate in the rulemaking process, including an opportunity to submit comments on the proposed rule and the information supporting the rule through the submission of written data, views, and arguments.  5 U.S.C. § 553.

53.	By failing to specify whether or when the OWCP might adopt a change to the payment system, or specifically how the CMS process may or may not be modified, the OWCP denied PCM and other interested parties the opportunity to meaningfully participate in the rulemaking process by providing specific, informative comments in violation of the APA.  As the OWCP recognized in the Final Rule, "[p]roposed § 30.701(c)(1)(ii) *alerted* providers that *in the future*, OWCP *may* adopt certain provisions contained within the Home Health Perspective Payment System, which was devised by CMS."  84 Fed. Reg. at 3,038.  Such an explanation is too vague to facilitate meaningful opportunity to provide comments on the proposed rule.

54.	Moreover, agency regulations are intended to provide notice to the regulated public regarding mandatory or prohibited conduct or procedures. Regulations cannot be used as a means of notice for some future, unspecified change in requirements.

**E.	Exclusion of Providers**

55.	The Final Rule adopted two new bases for excluding providers.  In section 30.715(i), a provider may be excluded for failing to inform OWCP of "any change in [its] provider status" as required in section 30.700, and in section 30.715(j), a provider may be

excluded for engaging in conduct related to care found by OWCP to be "misleading, deceptive or unfair." *Id.* at 3,040, 3,057.

56. These new rules are vague, overly broad, and arbitrary because they provide the OWCP unfettered discretion in excluding providers and fail to inform providers of actions that may lead to exclusion. For example, section 30.715(i)'s reference to a change in the "provider status" is overly vague because it incorporates the already vague, new language in section 30.700(a) – that a provider must certify that it "satisfy[ies] all applicable Federal and state licensure and regulatory requirements." A provider already lacks notice regarding which licensure and regulatory requirements trigger the certification update and thus lacks notice of the risk that it may be excluded by the OWCP as a provider. Moreover, section 30.715(j)'s reference to "unfair" conduct is overly broad and provides far too much discretion to the OWCP where the risk of exclusion is concerned.

57. The OWCP, nonetheless, found in adopting these rules that no additional clarification was required because "the Department firmly believes that the grounds upon which it may exclude a provider involve matters of administrative discretion that need not be further defined." *Id.* at 3,040.

58. Such overly broad and vague regulations, coupled with the OWCP's blatant acknowledgment that its intent was to establish unfettered discretion, violates the Constitutional guarantee of due process. A rule that does not contain a clear or objectively ascertainable standard may not be upheld. It must be invalidated if it fails to provide regulatory standards that would inform the public and guide the agency in discharging its authorized function. *See Flanagan v. Munger*, 890 F.2d 1557, 1569 (10th Cir. 1989) ("A regulation is vague on its face

when it 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' The rule should comport with a 'rough idea of fairness ... and provide fair warning that certain kinds of conduct are prohibited.'" (citation omitted)).

**F.     OWCP Contracting for Services of Supplies**

59.     The Final Rule adds a new regulation that authorizes OWCP to "contract with a specific provider or providers to supply non-physician medical services or supplies" directly to claimants. 84 Fed. Reg. at 3,034, 3,052 (amending 20 C.F.R. § 30.400(c)). But such authority goes beyond the scope of the plain language of the EEOICPA.

60.     EEOICPA Section 7384t provides:

> **(b) Persons furnishing benefits**
> (1) These services, appliances, and supplies shall be furnished by or on the order of United States medical officers and hospitals, or, at the individual's option, by or on the order of physicians and hospitals designated or approved by the President.

42 U.S.C.A. § 7384t (b)(1). Thus, under the plain language of the statute, medical benefits *shall* be at the individual's option, or by an order of U.S. medical officers or hospitals, or by order of government-designated physicians or hospitals.

61.     Under the Act, the OWCP lacks authority to provide medical services or supplies to claimants by contracting with providers.

62.     The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be: … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

63. PCM and other commenters raised the concern that the OWCP lacked statutory authority to contract with providers for services. In response to such comments, the OWCP stated that it was "codifying OWCP's *inherent authority* to contract with specific providers to provide non-physician services and appliances to beneficiaries." 84 Fed. Reg. at 3,034 (emphasis added). In addition, the OWCP explained that "[s]ince OWCP has been delegated the President's authority under section 7384t(b)(2), it clearly has the authority to regulate in this manner." *Id.*

64. Such conclusory statements about its "inherent authority" do not provide statutory authority to the OWCP to regulate in this manner and, therefore, the Final Rule exceeds the OWCP's statutory authority in violation of the APA.

## CLAIMS FOR RELIEF

### COUNT ONE

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 ("DJA") and
5 U.S.C. § 706 ("APA") that the Final Rule Is Arbitrary and Capricious**

65. PCM incorporates the prior allegations as if fully set forth herein.

66. The DJA empowers the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Similarly, the APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

67. The APA requires this Court to "hold unlawful and set aside agency action agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

68.     "An agency rule is arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Licon v. Ledezma*, 638 F.3d 1303, 1308 (10th Cir. 2011).

69.     The OWCP's Final Rule is arbitrary and capricious because it ignores Congress' intent to provide an efficient, uniform, and adequate compensation program for affected workers, which eliminates the prior presumption against compensation and removes obstacles and delays imposed by regulatory processes.  It fails to offer any reasoned explanation for its departure from Congress' mandate to remove administrative burdens and delays in favor of a presumption of care and benefits to affected claimants.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions.").

70.     Because the Final Rule is arbitrary and capricious and not in accordance with the law, it must be declared invalid and set aside.

## COUNT TWO

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 ("DJA") and
5 U.S.C. § 706 ("APA") that the Final Rule Is Being Imposed Without
Observance of Procedure Required by Law**

71.     PCM incorporates the prior allegations as if fully set forth herein.

72.     The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . [promulgated] without observance of procedure required by law."  5 U.S.C.A. § 706(2)(D).

73.     A regulation is procedurally "flawed" and "invalid" where it fails to provide sufficient detail and information "required for meaningful comment." *Estate of Smith v. Bowen*, 656 F. Supp. 1093, 1099 (D. Colo. 1987).

74.     The Final Rule violates the procedural mandates of the APA because the Respondents' inclusion of overly broad and vague rules, including the unspecified intent to take future action to change the OWCP's payment system, failed to provide the public with a meaningful opportunity to participate in the rulemaking process, including an opportunity to submit comments on the NPRM through the submission of written data, views, and arguments. *Id*. § 553.

75.     The Final Rule violates the procedural mandates of the APA because the Respondents failed to appropriately consider and respond to comments submitted during the comment period and have not appropriately addressed the legal, technical, and economic concerns that were raised by PCM and other interested stakeholders in the Final Rule.  *Id.*

76.     Because the Final Rule was promulgated without observance of the procedures required by the APA, it must be declared invalid and set aside.

## COUNT THREE

### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 ("DJA") and 5 U.S.C. § 706 ("APA") that the Final Rule Is Contrary to Constitutional Right

77.     PCM incorporates the prior allegations as if fully set forth herein.

78.     The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right."  5 U.S.C. § 706(2)(B).

79. Rules or regulations that are overly broad or vague violate the right to Due Process under the Fourteenth Amendment of the United States Constitution. U.S. Const. Amend. XIV.

80. "A regulation is vague on its face when it 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' The rule should comport with a 'rough idea of fairness ... and provide fair warning that certain kinds of conduct are prohibited.'" *See Flanagan v. Munger*, 890 F.2d 1557, 1569 (10th Cir. 1989) (citation omitted)). Rules or regulations that do not contain a clear or objectively ascertainable standard may not be upheld.

81. The Final Rule's inclusion of standards, such as the enrollment certification requirement and provider exclusion standards, are overly broad and vague such that they fail to give providers notice and fair warning of the regulatory requirements and prohibitions in violation of constitutional rights.

82. Because the Final Rule violates constitutional rights, it must be declared invalid and set aside.

## COUNT FOUR

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 ("DJA") and
5 U.S.C. § 706 ("APA") that the Final Rule Exceeds Statutory Authority**

83. PCM incorporates the prior allegations as if fully set forth herein.

84. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be: … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

85. "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

86. The Final Rule's provision imposing a lengthy preauthorization process and changing the date of eligibility (*see* 84 Fed. Reg. at 3,034-35, 3,052 (amending 20 C.F.R. § 30.403(a)-(c)), is contrary to the plain language of EEOICPA sections 7384d(b) requiring "timely" compensation to claimants and 7384t(d) establishing the eligibility date as the date claim was filed and, thus, exceeds the bounds of OWCP's statutory authority.

87. The Final Rule's provision authorizing OWCP to "contract with a specific provider or providers to supply non-physician medical services or supplies" directly to claimants, (*see* 84 Fed. Reg. at 3,034, 3,052 (amending 20 C.F.R. § 30.400(c)), is contrary to the plain language of EEOICPA section 7384(t) and confers authority on the OWCP that exceeds the bounds of its statutory authority.

88. Because the Final Rule exceeds the OWCP's statutory authority under the EEOICPA, it must be declared invalid and set aside.

## DEMAND FOR JUDGMENT

PCM respectfully requests the following relief from the Court:

89. A declaratory judgment that the Final Rule is invalid and must be set aside as "arbitrary and capricious" under the APA;

90. A declaratory judgment that the Final Rule is invalid and must be set aside as an action taken "without observance of procedure required by law" under the APA;

91.    A declaratory judgment that the Final Rule is invalid and must be set aside as an action taken in "violation of constitutional rights" under the APA;

92.    A declaratory judgment that the Final Rule is invalid and must be set aside because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of the APA;

93.    Temporary or preliminary relief enjoining the Final Rule from having any legal effect;

94.    A final, permanent injunction preventing the Respondents from implementing, applying, or enforcing the Final Rule; and

95.    All other relief to which PCM may be entitled, including attorney's fees and costs of court.

Dated this 19th day of March, 2019.

Respectfully submitted,

Mark B. Wiletsky
HOLLAND & HART LLP
One Boulder Plaza
1800 Broadway, Suite 300
Boulder, CO 80302
Phone: (303) 473-2864
mbwiletsky@hollandhart.com


 */s/ Kristina (Tina) Van Bockern*
Kristina (Tina) R. Van Bockern
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO  80202
Phone: (303) 295-8107
trvanbockern@hollandhart.com

**ATTORNEYS FOR PETITIONER**